## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LINDSEY WILLIAMS-DIGGINS, LOLETHA CAMMON, JONATHAN MILLER, and JONATHON WADE, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>TRANSUNION LLC; and SALESFORCE, INC.,<br><br>*Defendants*. | Case No. 1:25-cv-11525<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

Plaintiffs Lindsey Williams-Diggins, Loletha Cammon, Jonathan Miller, and Jonathon Wade ("Plaintiffs") bring this Class Action Complaint on behalf of themselves, and all others similarly situated, against Defendants TransUnion LLC ("TransUnion") and Salesforce, Inc. ("Salesforce") (collectively "Defendants"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to them, which are based on personal knowledge:

## NATURE OF THE ACTION

1.      Plaintiffs bring this action against Defendants for their failure to properly secure and safeguard highly valuable, protected, personally identifiable information in their possession and/or control, including, but not limited to, individuals' names, dates of birth, and Social Security numbers.

2.      As Defendants are or should have been aware, this type of personal and sensitive data is highly targeted and sought after by hackers who seek to exploit that data for nefarious

1

purposes. In the wrong hands, these types of sensitive data may be wielded to cause significant harm to individuals including Plaintiffs and the Class Members.

3.      TransUnion is one of the three major credit reporting agencies in the United States. The information collected and maintained by credit reporting agencies, such as TransUnion, includes detailed personal information about consumers' financial and credit histories, including but not limited to names, current and former addresses, dates of birth, Social Security numbers, phone numbers, and other financial information.

4.      By collecting vast troves of sensitive information, TransUnion is well-aware of the responsibility it owes to individuals to whom that information relates stating that: "[t]he security and protection of personal data is our **highest priority**. We are committed to aligning with industry-leading leading, cyber risk management best practices and complying with all applicable legal and regulatory requirements."[1]

5.      As part of TransUnion's business operations, TransUnion uses Salesforce's cloud-based customer relationship management ("CRM") platform to store consumers' PII, including the PII of Plaintiffs and Class Members.

6.      Salesforce is a cloud-based software-as-a-service ("SaaS") company that offers a suite of integrated products and services that helps companies manager customer interactions, streamline sales, and deliver personalized marketing and commerce experiences.[2] Salesforce is used by numerous corporate customers, including TransUnion.

---

[1] *2024 Global Impact Report*, TransUnion, https://www.transunion.com/content/dam/ transunion/global/business/documents/2024-global-impact-report.pdf, at 30 (emphasis added) (last visited Sept. 23, 2025).
[2] *What is Salesforce?*, Salesforce, https://www.salesforce.com/products/what-is-salesforce/ (last visited Sept. 23, 2025).

7. Salesforce recognizes the responsibility of protecting the PII it is entrusted, stating that "Salesforce builds security into everything we do so businesses can focus on growing and innovating."[3]

8. Despite Defendants' duties to safeguard the PII they collect and maintain, on or about August 28, 2025, TransUnion began notifying consumers that it had suffered a cybersecurity incident which impacted personal data on a third-party application used by TransUnion (the "Data Breach").[4]

9. While TransUnion has not yet disclosed the identity of the compromised, third-party application, news sources have indicated that cybercriminals likely gained access to TransUnion's Salesforce CRM account as a result of a successful social engineering attack that leveraged a malicious version of Salesforce's Data Loder application.[5]

10. The cybercriminals responsible for the Data Breach—the ShinyHunters extortion group—have claimed to have stolen 4.4 million records related to U.S. consumers, including Social Security numbers stored in plain text from TransUnion's Salesforce CRM.[6]

11. A key attack vector that the cybercriminals successfully exploited in the Data Breach was Defendants' use of OAuth 2.0 Device Flow protocols, *i.e.*, single sign-on, to authenticate and access TransUnion's CRM, which allowed the cybercriminals to bypass any

---

[3] *Salesforce Security*, Salesforce, https://security.salesforce.com/ (last visited Sept. 23, 2025).

[4] *Data Breach Notifications*, Office of the Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/3dcd9b7c-bce3-4685-bffd-f728ce96e2fd.html (last visited Sept. 23, 2025).

[5] Bill Toulas, *TransUnion suffers data breach impacting over 4.4 million people*, BleepingComputer (Aug. 28, 2025), https://www.bleepingcomputer.com/news/security/transunion-suffers-data-breach-impacting-over-44-million-people/.

[6] *TransUnion notifying more than 4.4 U.S. million consumers of data breach (1)*, DataBreaches.Net (Aug. 28, 2025), https://databreaches.net/2025/08/28/transunion-notifying-more-than-4-4-u-s-million-consumers-of-data-breach/.

multi-factor authentication when accessing TransUnion's CRM. Since the Data Breach, Salesforce has announced certain data security changes, including restricting the use of accessing its Data Loader via single sign-on.[7]

12.     As a direct and proximate result of Defendants' failure to implement and follow basic, standard data security procedures, Plaintiffs' and Class Members' PII has been compromised by cybercriminals.

13.     The harm resulting from a data privacy breach manifests in a number of ways, including identity theft and financial fraud. The exposure of a person's through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. Mitigating that risk—to the extent it is even possible to do so—requires individuals to devote significant time and money to closely monitor their credit, financial accounts, and email accounts, and take a number of additional prophylactic measures.

14.     Plaintiffs and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, and similar forms of criminal mischief—risks which may last for the rest of their lives. Consequently, Plaintiffs and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

15.     Plaintiffs, on behalf of themselves and the Class as defined herein, bring claims for negligence, negligence *per se*, breach of implied contract, unjust enrichment, and declaratory

---

[7] Swami, *Protecting Your Salesforce Org: Navigating the Upcoming Connected App Restrictions & Lessons from the Data Loader Breach*, Sweet Potato Tec (Aug. 26, 2025), https://www.sweetpotatotec.com/protecting-salesforce-connected-app-restrictions-data-loader-breach/

4

judgment, seeking damages, with attorneys' fees, costs, and expenses, and appropriate injunctive and declaratory relief.

16.     To recover from Defendants from these harms, Plaintiffs and the Class seek damages in an amount to be determined at trial, declaratory judgment, and injunctive relief requiring Defendants to: (1) investigate and disclose, expeditiously, the full nature of the Data Breach and the types of PII accessed, obtained, or exposed by the hackers; (2) implement improved data security practices to reasonably guard against future breaches of PII possessed by Defendants; and (3) provide, at Defendants' own expense, all impacted victims with lifetime identity protection services.

## PARTIES

17.     Plaintiff Lindsey Williams-Diggins is an adult, who at all relevant times, is and was a citizen of the State of Ohio.

18.     Plaintiff Loletha Cammon is an adult, who at all relevant times, is and was a citizen of the State of California.

19.     Plaintiff Jonathan Miller is an adult, who at all relevant times, is and was a citizen of the State of New Jersey.

20.     Plaintiff Jonathon Wade is an adult, who at all relevant times, is and was a citizen of the State of Indiana.

21.     Defendant TransUnion LLC is Delaware limited liability company with a principal place of business located in Chicago, Illinois.[8]

---

[8] Because jurisdiction is based on 28 U.S.C. § 1332(d), TransUnion's citizenship is based on its state of incorporation and the location of its principal place of business. *See Calchi v. TopCo Assocs., LLC*, 676 F. Supp. 3d 604, 614 (N.D. Ill. 2023) ("In the ordinary case, an LLC's citizenship is determined by the citizenship of each of its members. But in a CAFA case, an LLC's citizenship is determined by its state of organization and its principal place of business.").

22.     Defendant Salesforce, Inc. is a Delaware corporation with a principal place of business located in San Francisco, California.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act because Plaintiffs and at least one member of the Class, as defined below, are citizens of a different state than Defendants, there are more than 100 members of each of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

24.     This Court has personal jurisdiction over Defendant TransUnion because TransUnion resides in the State of Illinois.

25.     This Court has personal jurisdiction of Defendant Salesforce because Salesforce conducts substantial business within the State of Illinois, including operating a sales center at the Salesforce Tower in Chicago, Illinois.

26.     This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1), because at least one Defendant resides in this District, a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District; and Defendants conduct substantial business within this District.

## FACTUAL BACKGROUND

**A.     TransUnion Collects and Maintains Vast Amounts of Consumer Information.**

27.     TransUnion is one of the three major credit reporting agencies in the United States. TransUnion was originally formed as a holding company for Union Tank Car Company in 1968.

The following year, TransUnion acquired the Credit Bureau of Cook County, which maintained 3.6 million credit accounts.[9]

28.     In the decades following its formation, TransUnion continued to expand, reaching full coverage in the United States in the late 1980's, "maintaining and updating information on virtually every market-active consumer in the country."[10]

29.     TransUnion has continued to expand its business over the years, and currently "collects and maintains credit information on over 1 billion consumers worldwide, with approximately 200 million of those based in the U.S."[11]

30.     While TransUnion is considered the smallest of the three major credit bureaus, TransUnion reported net income of $284 million in 2024.[12]

31.     As part of its credit reporting business, TransUnion collects and maintains the PII of millions of consumers, including their names, addresses, Social Security numbers, dates of birth, employment history, and details on their financial histories, including balances, payment history, and loan information, including the PII of Plaintiffs and Class Members.[13]

32.     By virtue of participating in the U.S. credit market, Plaintiffs and Class Members indirectly or directly entrusted their sensitive and confidential PII to TransUnion, and therefore reasonably expected that Defendants would safeguard their PII from unauthorized access.

---

[9] *About TransUnion*, TransUnion, https://www.transunion.com/about-us (last visited Sept. 23, 2025).

[10] *Id.*

[11] Toulas, n. 5.

[12] *TransUnion Announces Fourth Quarter and Full-Year 2024 Results and Refreshed Capital Allocation Framework*, TransUnion (Feb. 13, 2025), https://newsroom.transunion.com/transunion-announces-fourth-quarter-and-full-year-2024-results-and-refreshed-capital-allocation-framework/.

[13] *Exploring Your Credit Report*, TransUnion, https://www.transunion.com/how-to-read-your-credit-report (last visited Sept. 23, 2025).

33.     Due to the sensitivity of the PII that Defendants handle, collect, and store, they are or should have been aware of critical responsibility to safeguard this information—and, therefore, how devastating its theft is to individuals whose information has been stolen.

34.     By requesting, obtaining, collecting, storing, and deriving a benefit from Plaintiffs' and Class Members' PII, Defendants assumed equitable and legal duties to safeguard and keep confidential Plaintiffs' and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

**B.     TransUnion Uses Salesforce's Data CRM Platform to Store Consumers' PII.**

35.     Upon information and belief, TransUnion uses Salesforces' CRM platform to conduct its business and ultimately store the PII it collects and maintains on Plaintiffs and Class Members.

36.     Salesforce is a cloud-based SaaS company that provides a customer relation management platform to various corporate entities, including TransUnion. Salesforce provides its services to over 150,000 customers across over fifteen different industries.[14]

37.     A CRM platform is a system that allows a company to manage their interactions with current and potential customers. Put differently, Salesforce's CRM platform allows companies, such as TransUnion, to track each interaction they have with a customer, including sales calls, customer service interactions, and marketing emails.[15]

38.     Notably, Salesforce users can access their Salesforce platform through a variety of "Connected Apps" with one such connected app being the Salesforce "Data Loader."

---

[14] *Salesforce statistics you should know in 2024 — and beyond*, Vention, https://ventionteams.com/salesforce/statistics (last visited Sept. 23, 2025).
[15] *What Is CRM (Customer Relationship Management)?*, Salesforce, https://www.salesforce.com/crm/what-is-crm/ (last visited Sept. 23, 2025).

39. The Data Loader is an application that lets Salesforce users insert, update, delete, or export large volumes of data in Salesforce.[16]

40. The Data Loaders supports OAuth authentication, in which a Salesforce user can access their CRM account without having to enter a username or password, therefore bypassing any multi-factor authentication ("MFA").

41. During the regular course of providing its CRM platform to its customers, including TransUnion, Salesforce is provided with individuals' PII, including that of Plaintiffs and Class Members.

42. As a major SaaS company, Salesforce recognizes the importance of safeguarding the PII it is entrusted and maintains, stating that it "understand[s] the importance of adopting industry-leading security practices and technology needed to protect our customers' data" and further representing that "implementing basic security practices to secure customers' data always comes first at Salesforce."[17]

## C. TransUnion Expressly Recognizes the Importance of Data Security.

43. TransUnion is well-aware of the foreseeability and repercussions of cybersecurity threats, including data breaches, having observed numerous other well-publicized data breaches involving major corporations over the years, including the data breach at fellow credit reporting agency, Equifax.

44. TransUnion expressly recognizes the importance of securing consumers' sensitive data, stating: "[t]he security and protection of personal data is our highest priority. We are

---

[16] *Data Loader*, Salesforce, https://help.salesforce.com/s/articleView?id=xcloud.data_loader_about.htm&type=5 (last visited Sept. 23, 2025).
[17] *Commitment to Customer Trust*, Salesforce (2020), https://org62.my.salesforce.com/sfc/p/#000000000062/a/3y000000UhUB/wJ940mJvwK_JEKGhKGcRw8cilzFFrGavpj2L447NtpU

committed to aligning with industry-leading, cyber risk management best practices and complying with all applicable legal and regulatory requirements" and further explaining that "[p]rivacy compliance is of paramount importance to TransUnion's ongoing success."[18]

45.     TransUnion also represents that it is "organized to develop, implement and maintain a robust information security program consistent with TransUnion's size and complexity. We employ multiple, overlapping layers of security controls to reduce risks and vulnerabilities associated with single points of failure."[19]

46.     In addition to recognizing the importance of data security, TransUnion also expressly recognizes the foreseeability that it would be targeted by a cyberattack or that a third-party provider would be targeted by a cyberattack stating: "cyber risk within the financial services sector remains high due to increased frequency and sophistication of threats across multiple vectors, including supply chain and vulnerability exploitation, cybercrime and ransom operations."[20]

47.     Indeed, TransUnion specifically recognizes in its 2024 annual report that it faces significant cybersecurity risks:

> As a global consumer credit reporting agency and provider of risk and information solutions, we collect, store and transmit a large amount of sensitive and confidential consumer information on over one billion consumers, including financial information, personally identifiable information and protected health information. As such, we rely heavily on computer systems, hardware, software and technology infrastructure for both internal and external operations that are critical to our business. We face significant and evolving cybersecurity risks that threaten the confidentiality, integrity and availability of our systems and data including unintentional events and deliberate attacks by third parties or insiders, such as the

---

[18] *2024 Global Impact Report* at 30, 37
[19] *Id.* at 30–31.
[20] *Id.*

exploitation of "bugs" or security vulnerabilities in software and hardware and sophisticated attack methods such as ransomware.[21]

48.     And TransUnion further recognizes that "We experience numerous attempts to access our computer systems, software, networks, data and other technology assets on a daily basis. We have also experienced cyberattacks and other security incidents, and expect that such attacks and incidents will continue in varying degrees in the future."[22]

49.     Despite TransUnion's commitment to data security, Plaintiffs' and Class Members' PII was accessed and stolen by cybercriminals.

**D.      The Data Breach.**

50.     On or about August 28, 2025, TransUnion announced that it had suffered a cybersecurity incident that impacted the personal information of consumers that was stored on a third-party application that was serving its U.S. customer support operations.

51.     According to TransUnion, the Data Breach occurred on July 28, 2025 and was discovered two days later.[23]

52.     TransUnion has reported that the Data Breach impacted over 4.4 million consumers in the U.S. and has further indicated consumers' names, dates of birth, and Social Security numbers were compromised in the Data Breach.[24]

---

[21] *2024 Annual Report*, TransUnion, https://investors.transunion.com/~/media/Files/T/Transunion -IR-V2/annual-reports/2024/2024-annual-report.pdf, at 31 (last visited Sept. 23, 2025).
[22] *Id.*
[23] Toulas, n. 5.
[24] Zack Whittaker, *TransUnion says hackers stole 4.4 million customers' personal information*, TechCrunch (Aug. 28, 2025), https://techcrunch.com/2025/08/28/transunion-says-hackers-stole- 4-4-million-customers-personal-information/.

53.     While TransUnion has not disclosed the name of the compromised third-party application, news reports have indicated that the Data Breach is linked to TransUnion's use of Salesforce's CRM.[25]

54.     On or about the same day that TransUnion announced the Data Breach, the Shiny Hunters extortion group took responsibility for the attack, claiming to have stolen over thirteen million records, including 4.4 million records from the U.S. alone, from TransUnion's Salesforce CRM. The group further alleged that the stolen information included Social Security numbers stored in plain text and threaten to leak the stolen data on a forum called "BreachStars."[26]

55.     Based on news reports to date, cybercriminals intentionally accessed TransUnion's Salesforce CRM in an attack designed to access Plaintiffs' and Class Members' valuable PII stored therein, and that these malicious actors were successful in the attack.

56.     According to news reports, the Data Breach is linked to a wave of cyberattacks linked to the Shiny Hunters extortion group who have been using voice phishing attacks to target Salesforce customers to steal data from companies' Salesforce CRM.[27]

57.     In these Salesforce attacks, the threat actors have impersonated IT support personnel, requesting that the targeted individual accept a connection to the Salesforce Data Loader by instructing the targeted employee to update to reconnect to the Salesforce Data Loader.[28]

58.     More specifically, the threat actors persuade the targeted individual to visit Salesforce's connect app setup page, and, once there, the target is asked to enter a "connection

---

[25] *TransUnion notifying more than 4.4 U.S. million consumers of data breach (1)*, n. 6.
[26] *Id.*
[27] Toulas, n. 5.
[28] Bill Toulas, *Google: Hackers target Salesforce accounts in data extortion attacks*, BleepingComputer (June 4, 2025), https://www.bleepingcomputer.com/news/security/google-hackers-target-salesforce-accounts-in-data-extortion-attacks/.

code" for OAuth access which is linked to a malicious version of Salesforce's Data Loader under the criminals' control.

59.     The connection code therefore bypasses any MFA the target has implemented and grants cybercriminals access to the company's Salesforce CRM platform

60.     Once the threat actors' Data Loader has been connected to the victim's Salesforce platform, the threat actors use the Data Loader to export data from company's Salesforce CRM.[29]

61.     Upon information and belief, the Data Breach is the result of Defendants' failure to implement adequate data security measures.

**E.     The Risks of Storing Valuable PII are Well-Known to TransUnion and Salesforce.**

62.     Given Defendants' role in handling sensitive consumer data, Defendants were well aware at all relevant times that the PII that they obtain, collect, store, use, and derive a benefit from is highly sensitive and of significant value to those who seek to use it for wrongful purposes.

63.     Defendants also knew that a breach of TransUnion's Salesforce CRM and the resulting exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII.

64.     These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at financial services companies, including: CapitalOne, KeyBank, Equifax, Flagstar Bank, and TMX Finance Corporate Services. These breaches put Defendants on notice that their electronic records would be targeted by cybercriminals.

65.     In addition, in recent years, numerous high-profile data breaches have occurred as a result of third-party tools, including Progress Software Corporation (MOVEit file transfer software); Fortra (GoAnyWhere file transfer software); CLEO (file transfer software), and

---

[29] *Id.*

Snowflake (cloud storage accounts). These breaches again put Defendants on notice that electronic records stored on third-party systems would be targeted by cybercriminals.

66.     PII has considerable value and constitutes an enticing and well-known target for hackers. Hackers can easily sell stolen data, as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[30]

67.     Criminals often trade stolen PII on the "cyber black market" for years following a breach. Cybercriminals can also post stolen PII on the internet, thereby making such information publicly available.

68.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the United States. In 2024, there were 6,670 recorded data breach incidents, exposing over 16.8 billow records. The United States specifically saw a 12% year-over-year increase in data breaches as compared to 2023.[31]

69.     In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, approximately 2.675 million people reported some form of identity fraud compared to approximately 6.5 million people in 2024.[32]

---

[30] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

[31] *2025 Global Threat Intelligence Report*, Flashpoint (2025), https://go.flashpoint.io/2025_GTIR.

[32] *Facts & Statistics: Identity Theft and Cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited Sept. 23, 2025); *Current Graph, Identity Theft And Fraud Reports, 2020-2024*, Insurance Information Institute, https://www.iii.org/graph-archive/96074 (last visited Sept. 23, 2025).

70.     The financial sector is also a prime target for threat actors. Between January 2018 and September 2023, financial companies have suffered 2,260 data breaches, impacting over 232 million records.[33]

71.     The financial sector is "disproportionately targeted by threat actors" because of a simple rationale: "[t]hreat actors target organizations that have what they want and what pays big – data and money. Data can be sold for money and vulnerabilities that enable access to both data and money."[34]

72.     The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiffs and Class Members especially vulnerable to identity theft, tax fraud, credit and bank fraud, and more.

73.     **Social Security numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Social Security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

74.     The Social Security Administration warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

---

[33] Paul Bischoff, *Financial data breaches accounted for 232 million leaked records from January 2018 to September 2023*, Comparitech (Oct. 4, 2023), https://www.comparitech.com/blog/vpn-privacy/financial-data-breaches/#:~:text=2%2C260%20financial%20data%20breaches%20 from,over%20101%20million%20in%20total.

[34] Jen Miller-Osborn, *3 Reasons Cyberattacks Target Financial Services and How to Fight Back*, Paloalto Network (Aug. 31, 2021), https://www.paloaltonetworks.com/blog/2021/08/financial-services-cyberattacks/.

Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

If you receive a new Social Security Number, you should not be able to use the old number anymore.

For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[35]

75.     Social Security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often Social Security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes Social Security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

76.     Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Indeed, even where cybercriminals do not gain access to a complete set of an individual's PII during a data breach, cybercriminals can cross-reference two or more sources of PII to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

---

[35] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

77.     The development of Fullz packages means stolen PII from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information (such as emails, phone numbers, or credit card numbers) is not included in the PII stolen in a specific incident, criminals can easily create a Fullz package that links that information together and sell the package at a higher price.

78.     Importantly, once a cybercriminal has a Fullz package, they can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take overs, medical identity fraud, tax refund fraud, and buy now pay later frauds.[36] Most problematic, however, is that cybercriminals in possession of a Fullz package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[37]

79.     Based on the value of individuals' PII to cybercriminals, and the foreseeability of a data breach, Defendants knew or should have known the importance of safeguarding the PII entrusted to them and of the foreseeable consequences that would arise if their data security systems were breached. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

**F.      TransUnion and Salesforce Were Specifically Aware of the Attack Vector that Led to The Data Breach.**

80.     TransUnion and Salesforce were both aware of their responsibility in protecting consumers' PII. In a Blog posted dated March 14, 2024, Salesforce explained:

> Cybersecurity is a shared responsibility between a provider and their customers. While Salesforce builds enterprise-grade security into every part of our platform, customers play a vital role in protecting their data — especially amid a recent rise

---

[36] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME (Mar. 3, 2024), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.
[37] *Protection Against Fullz and Fraud*, INTEGRITY (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.

in sophisticated social engineering and phishing attacks targeting Salesforce customers.

81.     TransUnion and Salesforce were also aware that threat actors were exploiting the attack vector that led to the Data Breach as early as March of 2025.

82.     In the same March 14, 2025 Blog post, Salesforce alerted its customers, including TransUnion, of the type of voice phishing attack that led to the Data Breach, stating:[38]

> Threat actors have been observed employing various social engineering tactics, including voice phishing (i.e., "vishing"), to impersonate members of an IT Support team over the phone. They have been reported luring our customers' employees and third-party support workers to phishing pages designed to steal credentials and MFA tokens or prompting users to navigate to the login.salesforce[.]com/setup/connect page in order to add a malicious connected app. In some cases, we have observed that the malicious connected app is a modified version of the Data Loader app published under a different name and/or branding. Once the threat actor gains access to a customer's Salesforce account or adds a connected app, they use the connected app to exfiltrate data.

83.     Despite being aware that cybercriminals were utilizing a malicious version of the Data Loader app as early as March 2025, however, Defendants failed to implement adequate data security measures to prevent the Data Breach from occurring.[39]

**G.     TransUnion Failed to Comply with FTC Guidelines and Industry Best Practices.**

84.     Defendants are prohibited by the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45 from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

---

[38] *Protect Your Salesforce Environment from Social Engineering Threats*, Salesforce Security (March 12, 2025), https://www.salesforce.com/blog/protect-against-social-engineering/.
[39] *Data Loader OAuth 2.0 Device Flow Removal*, Salesforce (Sept. 19, 2025), https://help.salesforce.com/s/articleView?id=005132367&type=1.

85. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[40]

86. In 2016, the FTC updated its publication titled Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.[41] The guidelines recommend that businesses implement the following:

    a. Businesses should promptly dispose of personal identifiable information that is no longer needed, and retain sensitive data "only as long as you have a business reason to have it;"

    b. Businesses should encrypt sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

    c. Businesses should thoroughly understand the types of vulnerabilities on their network and how to address those vulnerabilities;

    d. Businesses should install intrusion detection systems to promptly expose security breaches when they occur; and

    e. Businesses should install monitoring mechanisms to watch for large troves of data being transmitted from their systems.[42]

---

[40] *See Start with Security: A Guide for Business* (June 2015), Federal Trade Commission, available at: https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business.
[41] *See Protecting Personal Information: A Guide for Business*, Federal Trade Commission (Oct. 2016), Federal Trade Commission, available at: https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.
[42] *Id.*

87. In another publication, the FTC recommended that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[43]

88. Notably, the FTC treats the failure to employ reasonable data security safeguards as an unfair act or practice prohibited by Section 5 of the FTC Act. Indeed, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

89. Upon information and belief, Defendants failed to properly implement one or more of the basic data security practices recommended by the FTC. Defendants' failure to employ reasonable and appropriate data security measures to protect against unauthorized access to individuals' PII constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

90. Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[44]

---

[43] *See Start with Security: A Guide for Business*, n. 40.
[44] *See Framework for Improving Critical Infrastructure Cybersecurity*, National Institute of Standards & Technology (Apr. 16, 2018), App'x A, Table 2, available at https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.

91.     NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[45] Upon information and belief, Defendants failed to adhere to the NIST guidance.

92.     Further, cybersecurity experts have identified Further, cybersecurity experts have identified various best practices that should be implemented by entities in the financial industry, including the following:

    i.   Regularly assessing risks and auditing cybersecurity;

    ii.   Establishing a cybersecurity policy;

    iii.   Appointing a data protection officer;

    iv.   Securing networks;

    v.   Verifying user identities;

    vi.   Establishing secure password management;

    vii.   Continuously monitor user activity; and

    viii.   Manage third-party risks.[46]

93.     Upon information and belief, Defendants' failure to protect Plaintiffs' and Class Members' PII is a result of its failure to adopt reasonable safeguards as required by the FTC, NIST, and industry best practices.

---

[45] *Id.* at Table 2, 26-43.
[46] Yana Storchak, *12 Best Practices for Banking and Financial Cybersecurity Compliance*, Syteca (April 2, 2025), https://www.syteca.com/en/blog/banking-and-financial-cyber-security-compliance.

**H.     TransUnion is Subject to, and Failed to Comply with, the GLBA.**

94.     The Gramm-Leach-Bliley Act ("GLBA"), states that "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

95.     A "financial institution" is defined as "any institution the business of which is engaging in financial activities as described in section 1843(k) of title 12." 15 U.S.C. § 6809(3)(A). TransUnion is considered a financial institution for purposes of the GLBA as TransUnion is significantly engaged in financial activities. *See* 12 U.S.C. § 1843(k)(4).

96.     "Nonpublic personal information" means "personally identifiable financial information provided by a consumer to a financial institution; resulting from any transaction with the consumer or any service performed for the consumer; or otherwise obtained by the financial institution." 15 U.S.C. § 6809(4)(A)(i)–(iii). The PII involved in the Data Breach constitutes "nonpublic personal information" for purposes of the GLBA.

97.     TransUnion collects "nonpublic personal information," as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) & 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period, TransUnion was subject to the requirements of the GLBA, 15 U.S.C. §§ 6801, *et seq*., and is subject to numerous rules and regulations promulgated under the GLBA.

98.     The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably

22

foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 & 314.4. As alleged herein, TransUnion violated the Safeguards Rule.

99.     TransUnion's conduct resulted in a variety of failures to follow GLBA mandated rules and regulations, many of which are also industry standard. Among such deficient practices, the Data Breach demonstrates that TransUnion failed to implement (or inadequately implemented) information security policies or procedures such as effective employee training, adequate intrusion detection systems, regular reviews of audit logs and records, and other similar measures to protect the confidentiality of the PII it maintained.

100.     Had TransUnion implemented adequate data security protocols, the consequences of the Data Breach could have been avoided, or at least significantly reduced as the Data Breach could have been detected earlier, the amount of PII compromised could have been greatly reduced.

## I.     Plaintiffs' Experiences.

### *Plaintiff Lindsey Williams-Diggins*

101.     Upon information and belief, as part of Plaintiff Williams-Diggins's engagement in the credit market, TransUnion collected and maintained Plaintiff Williams-Diggins's PII. This information was, in turn, stored on Salesforce's CRM platform. In collecting, maintaining, using, and deriving a benefit from Plaintiff Williams-Diggins's PII, Defendants undertook a duty to act

reasonably in their handling of Plaintiff's PII. Defendants, however, did not take reasonable care of Plaintiff Williams-Diggins's PII, leading to its exposure and compromise as a direct and proximate result of Defendants' inadequate security measures.

102.     Plaintiff Williams-Diggins received a letter from TransUnion indicating that his PII collected and maintained by Defendants had been compromised in the Data Breach.

103.     Since the Data Breach, Plaintiff Williams-Diggins has been alerted by his credit monitoring services with Experian that his PII was found on the dark web.

104.     As a direct and proximate result of the Data Breach, Plaintiff Williams-Diggins has been required to spend his valuable time and effort mitigating the risk that his PII will be misused. These mitigation efforts include spending time reviewing his financial accounts and credit reports. Plaintiff would not have had to engage in these time intensive measures but for the Data Breach.

105.     As a direct and proximate result of the Data Breach, Plaintiff Williams-Diggins has suffered actual injury from having his PII exposed and/or stolen as a result of the Data Breach, including: (a) efforts to mitigate the risk of misuse of his PII; (b) damages to and diminution of the value of his PII, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (c) loss of privacy.

106.     Further, knowing that hackers accessed and exfiltrated his PII, and that this information likely has been or will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff Williams-Diggins to experience frustration, worry, and stress.

107.     As a direct and proximate result of the Data Breach, Plaintiff Williams-Diggins has been and will continue to be at a substantial and certainly impending risk for fraud and identity

24

theft and its attendant damages for years to come. Such a risk is real and certainly impending, and is not speculative given the highly sensitive nature of the PII compromised in the Data Breach.

***Plaintiff Loletha Cammon***

108. Upon information and belief, as part of Plaintiff Cammon's engagement in the credit market, TransUnion collected and maintained Plaintiff Cammon's PII. This information was, in turn, stored on Salesforce's CRM platform. In collecting, maintaining, using, and deriving a benefit from Plaintiff Cammon's PII, Defendants undertook a duty to act reasonably in their handling of Plaintiff's PII. Defendants, however, did not take reasonable care of Plaintiff Cammon's PII, leading to its exposure and compromise as a direct and proximate result of Defendants' inadequate security measures.

109. Plaintiff Cammon received a letter from TransUnion indicating that her PII collected and maintained by Defendants had been compromised in the Data Breach.

110. As a direct and proximate result of the Data Breach, Plaintiff Cammon has been required to spend her valuable time and effort mitigating the risk that her PII will be misused. These mitigation efforts include spending time reviewing her financial accounts and credit reports. Plaintiff would not have had to engage in these time intensive measures but for the Data Breach.

111. As a direct and proximate result of the Data Breach, Plaintiff Cammon has suffered actual injury from having her PII exposed and/or stolen as a result of the Data Breach, including: (a) efforts to mitigate the risk of misuse of her PII; (b) damages to and diminution of the value of her PII, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (c) loss of privacy.

112. Further, knowing that hackers accessed and exfiltrated her PII, and that this information likely has been or will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff Cammon to experience frustration, worry, and stress.

113. As a direct and proximate result of the Data Breach, Plaintiff Cammon has been and will continue to be at a substantial and certainly impending risk for fraud and identity theft and its attendant damages for years to come. Such a risk is real and certainly impending, and is not speculative given the highly sensitive nature of the PII compromised in the Data Breach.

***Plaintiff Jonathan Miller***

114. Upon information and belief, as part of Plaintiff Miller's engagement in the credit market, TransUnion collected and maintained Plaintiff Miller's PII. This information was, in turn, stored on Salesforce's CRM platform. In collecting, maintaining, using, and deriving a benefit from Plaintiff Miller's PII, Defendants undertook a duty to act reasonably in their handling of Plaintiff's PII. Defendants, however, did not take reasonable care of Plaintiff Miller's PII, leading to its exposure and compromise as a direct and proximate result of Defendants' inadequate security measures.

115. Plaintiff Miller received a letter from TransUnion indicating that his PII collected and maintained by Defendants had been compromised in the Data Breach.

116. As a direct and proximate result of the Data Breach, Plaintiff Miller has been required to spend his valuable time and effort mitigating the risk that his PII will be misused. These mitigation efforts include spending time reviewing his financial accounts and credit reports. Plaintiff would not have had to engage in these time intensive measures but for the Data Breach.

117. As a direct and proximate result of the Data Breach, Plaintiff Miller has suffered actual injury from having his PII exposed and/or stolen as a result of the Data Breach, including:

(a) efforts to mitigate the risk of misuse of his PII; (b) damages to and diminution of the value of his PII, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (c) loss of privacy.

118.     Further, knowing that hackers accessed and exfiltrated his PII, and that this information likely has been or will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff Miller to experience frustration, worry, and stress.

119.     As a direct and proximate result of the Data Breach, Plaintiff Miller has been and will continue to be at a substantial and certainly impending risk for fraud and identity theft and its attendant damages for years to come. Such a risk is real and certainly impending, and is not speculative given the highly sensitive nature of the PII compromised in the Data Breach.

### Plaintiff Jonathon Wade

120.     Upon information and belief, as part of Plaintiff Wade's engagement in the credit market, TransUnion collected and maintained Plaintiff Wade's PII. This information was, in turn, stored on Salesforce's CRM platform. In collecting, maintaining, using, and deriving a benefit from Plaintiff Wade's PII, Defendants undertook a duty to act reasonably in their handling of Plaintiff's PII. Defendants, however, did not take reasonable care of Plaintiff Wade's PII, leading to its exposure and compromise as a direct and proximate result of Defendants' inadequate security measures.

121.     Plaintiff Wade received a letter from TransUnion indicating that his PII collected and maintained by Defendants had been compromised in the Data Breach.

122.     As a direct and proximate result of the Data Breach, Plaintiff Wade has been required to spend his valuable time and effort mitigating the risk that his PII will be misused. These

mitigation efforts include spending time reviewing his financial accounts and credit reports. Plaintiff would not have had to engage in these time intensive measures but for the Data Breach.

123.    As a direct and proximate result of the Data Breach, Plaintiff Wade has suffered actual injury from having his PII exposed and/or stolen as a result of the Data Breach, including: (a) efforts to mitigate the risk of misuse of his PII; (b) damages to and diminution of the value of his PII, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (c) loss of privacy.

124.    Further, knowing that hackers accessed and exfiltrated his PII, and that this information likely has been or will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff Wade to experience frustration, worry, and stress.

125.    As a direct and proximate result of the Data Breach, Plaintiff Wade has been and will continue to be at a substantial and certainly impending risk for fraud and identity theft and its attendant damages for years to come. Such a risk is real and certainly impending, and is not speculative given the highly sensitive nature of the PII compromised in the Data Breach.

**J.      Plaintiffs and Class Members Suffered Damages.**

126.    For the reasons mentioned above, Defendants' conduct, which allowed the Data Breach to occur, caused Plaintiffs and Class Members significant injuries and harm in several ways. Plaintiffs and Members of the Class must immediately devote time, energy, and money to: (1) closely monitor their medical statements, bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4)

28

search for suitable identity theft protection and credit monitoring services, and pay to procure them.

127.    Once PII is exposed, there is virtually no way to recover the data or prevent future misuse. This is especially true here, where the information stolen during the Data Breach has been leaked on the dark web and remains available to download. As a result, Plaintiffs and Class Members must maintain heightened vigilance indefinitely. Further, Plaintiffs and Class Members have not been compensated for the unconsented and unauthorized disclosure of their PII, for which there is a robust market.

128.    As a direct result of the Data Breach, Plaintiffs and Class Members have suffered and will continue to suffer economic and other concrete harms, including but not limited to:

      f.      Unauthorized disclosure of their confidential information;

      g.      Loss of the control of their PII;

      h.      Identity theft, fraud, and misuse of medical and financial information;

      i.      Out-of-pocket expenses for credit monitoring, mitigation efforts, and fraud prevention tools;

      j.      Unauthorized charges and restricted access to financial accounts;

      k.      Emotional distress, anxiety, and loss of privacy;

      l.      Time and productivity lost dealing with the consequences of the breach;

      m.      Damage to credit scores, including from fraudulent inquiries; and

      n.      Continued and imminent risk of future fraud and identity theft due to their data being in the hands of unauthorized third parties.

129.    Individuals suffer harm each time their personal data is compromised and circulated on underground markets—even if they have been affected by prior breaches. The dark web contains vast, fragmented repositories of stolen information that can be aggregated by different

criminals for varied forms of fraud. Each subsequent breach increases the likelihood that a victim's sensitive data will be accessed by more actors and exploited in new and damaging ways.

130. Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there are typically significant time and effort associated with seeking reimbursement. There may also be a significant time lag between when personal information is stolen and when it is misused for fraudulent purposes.

131. Plaintiffs and Class Members place significant value on data security and consider a company's ability to protect personal information a key factor in their purchasing decisions. Many consumers are willing to pay more for services from organizations that demonstrate strong cybersecurity practices. Conversely, consumers are far less likely to share personal data with companies that have suffered a data breach—reflecting the reputational damage and business consequences that flow from failing to safeguard sensitive information.

132. By collecting and storing Plaintiffs' and Class Members' sensitive information, Defendants undertook a duty to safeguard it and avoid increasing the risk of identity theft or fraud. Because Defendants failed to uphold that duty, Plaintiffs seek the present value of identity protection services and other compensatory measures to address the current and future harm stemming from the Data Breach.

133. Additionally, Plaintiffs and Class Members are entitled to recover the reasonable use value of their PII that was accessed and exfiltrated without authorization. This form of compensation mirrors damages awarded in intellectual property cases for unauthorized use of intangible assets. As with a patent or trade secret, PII are non-rivalrous: their unauthorized use by

30

a third party does not eliminate the owner's ability to use them but still justifies compensation based on market value.

134.     Defendants continue to retain the PII of Plaintiffs and Class Members, which is contained on TransUnion's Salesforce CRM platform. As long as Defendants maintain possession of this information, Plaintiffs and Class Members have a strong and ongoing interest in ensuring that adequate safeguards are in place to prevent further unauthorized access or disclosure.

## CLASS ACTION ALLEGATIONS

135.     Plaintiffs bring this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the class defined as:

> All individuals in the United States whose PII was compromised in the Data Breach of which TransUnion noticed on or about August 28, 2025.

136.     Excluded from the Class are Defendants, their subsidiaries and affiliates, their officers, directors and members of their immediate families and any entity in which Defendants have a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

137.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class prior to moving for class certification.

138.     **Numerosity.** The class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. The exact size of the Class and the identities of the individual members thereof are ascertainable

through TransUnion's records, including, but not limited to, the files implicated in the Data Breach. Based upon public filings, the Class includes approximately 4.4 million individuals.

139.    **Commonality.** This action involves questions of law and fact that are common to Plaintiffs and the Class Members. Such common questions include, but are not limited to:

  a.    whether and to what extent Defendants have a duty to protect the PII of Plaintiffs and Class Members;

  b.    whether Defendants were negligent in collecting and storing Plaintiffs' and Class Members's PII;

  c.    whether Defendants have duties not to disclose the PII of Plaintiffs and Class Members to unauthorized third parties;

  d.    whether Defendants took reasonable steps and measures to safeguard Plaintiffs' and Class Members' PII;

  e.    whether Defendants failed to adequately safeguard the PII of Plaintiffs and Class Members;

  f.    whether Defendants breached their duties to exercise reasonable care in handling Plaintiffs' and Class Members' PII;

  g.    whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

  h.    whether Plaintiffs and Class Members are entitled to damages as a result of Defendants' wrongful conduct; and

i. whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

140. **Typicality.** Plaintiffs' claims are typical of the claims of the Class Members. The claims of Plaintiffs and Class Members are based on the same legal theories and arise from the same failure by Defendants to safeguard their PII. Plaintiffs and Class Members directly and/or indirectly entrusted Defendants with their PII, and it was subsequently compromised by an unauthorized third party.

141. **Adequacy of Representation.** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other Class Members Plaintiffs seeks to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; Plaintiffs intend to prosecute this action vigorously; and Plaintiffs' counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiffs and Plaintiffs' counsel.

142. **Superiority.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

143. **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages are common to Plaintiffs and each member of the Class. If Defendants breached their duty, then Plaintiffs and each Class member suffered damages by that conduct.

144. **Injunctive Relief.** Defendants have acted and/or refused to act on grounds that generally apply to the Class making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

145. **Ascertainability.** Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through TransUnion's books and records, including the files implicated in the Data Breach.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
NEGLIGENCE
(On Behalf of Plaintiffs and the Class)
(Against Both Defendants)

146. Plaintiffs restate and reallege all preceding allegations as if fully set forth herein.

147. Defendants owed a duty under common law to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and protecting the PII in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

148. Specifically, this duty included, *inter alia*: (a) designing, maintaining, and testing Defendants' security systems to ensure that Plaintiffs' and Class Members' PII was adequately

secured and protected; (b) implementing processes that would detect a breach of their security systems in a timely manner; (c) timely acting upon warnings and alerts, including those generated by their own security systems, regarding intrusions to their networks; and (d) maintaining data security measures consistent with industry standards.

149. Defendants' duty to use reasonable care arose from several sources, including but not limited to those described below.

150. Defendants have a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendants. By collecting, storing, and processing valuable PII that is routinely targeted by cybercriminals, Defendants were obligated to act with reasonable care to protect against these foreseeable threats.

151. Defendants also owed a common law duty because their conduct created a foreseeable risk of harm to Plaintiffs and Class Members. Defendants' conduct included their failure to adequately restrict access to computer networks, servers, and/or cloud computing accounts that held individuals' PII.

152. Defendants also knew or should have known of the inherent risk in collecting and storing massive amounts of PII, the importance of implementing adequate data security measures to protect that PII, and the frequency of cyberattacks such as the Data Breach that target third-party service providers.

153. Defendants breached the duties owed to Plaintiffs and Class Members and thus were negligent. Defendants breached these duties by, among other things: (a) mismanaging their systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and

compromise of PII; (b) mishandling their data security by failing to assess the sufficiency of their safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow their own privacy policies provided to customers; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII.

154. But for Defendants' wrongful and negligent breach of their duties owed to Plaintiffs and Class Members, their PII would not have been compromised.

155. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered injuries including:

     a.    theft of their PII;

     b.    unauthorized charges to their bank accounts;

     c.    costs associated with canceling and ordering new payment cards;

     d.    time spent reporting fraudulent activity;

     e.    costs associated with requesting credit freezes;

     f.    costs associated with the detection and prevention of identity theft;

     g.    costs associated with purchasing credit monitoring and identity theft protection services;

     h.    lowered credit scores resulting from credit inquiries following fraudulent activities;

    i.    costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

    j.    the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

    k.    damages to and diminution in value of their PII directly or indirectly entrusted to Defendants with the mutual understanding that Defendants would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others; and

    l.    continued risk of exposure to hackers and thieves of their PII, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs and Class Members.

156.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### NEGLIGENCE *PER SE*
**(On Behalf of Plaintiffs and the Class)**
**(Against Both Defendants)**

157.    Plaintiffs restate and reallege all preceding allegations as if fully set forth herein.

158.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Defendants for failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendants' duties.

159. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect customers' PII and not complying with the industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII obtained and stored and the foreseeable consequences of a data breach.

160. Plaintiffs and Class Members are consumers within the class of persons that Section 5 of the FTC Act was intended to protect.

161. Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

162. Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se*.

163. The GLBA states "that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

164. TransUnion violated the GLBA and the Safeguards Rule by failing to use reasonable measures to protect PII and not complying with the industry standards. TransUnion's conduct was particularly unreasonable given the nature and amount of PII it obtained and disclosed and the foreseeable consequences of a data breach.

165. Plaintiffs and Class Members are consumers within the class of persons the GLBA and the Safeguards Rule was intended to protect.

166. Moreover, the harm that has occurred is the type of harm that the GLBA and the Safeguards Rule were intended to guard against.

167.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered injuries, including those identified in paragraph 155 above.

168.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**
**(Against TransUnion)**

169.    Plaintiffs restate and reallege all preceding allegations as if fully set forth herein

170.    Plaintiffs and Class Members have an interest, both equitable and legal, in the PII about them that was conferred upon, collected by, and maintained by TransUnion and that was ultimately stolen in the Data Breach. This PII was conferred on TransUnion in most cases by third-parties but in some instances directly and/or indirectly by Plaintiffs and Class Members themselves.

171.    TransUnion benefitted from the conferral upon it of the PII pertaining to Plaintiffs and Class Members and by its ability to retain and use that information. TransUnion understood that it was in fact so benefitted. Indeed, TransUnion's business would not exist but for the need to collect, maintain, and sell Plaintiffs' and Class Members' PII to facilitate transactions between lenders and borrowers.

172.    TransUnion also understood and appreciated that the PII pertaining to Plaintiffs and Class Members was private and confidential and its value depended upon TransUnion maintaining the privacy and confidentiality of that PII.

173.    But for TransUnion's willingness and commitment to maintain its privacy and confidentiality, that PII would not have been transferred to and entrusted with TransUnion.

Further, if TransUnion had disclosed that its data security measures were inadequate, TransUnion would not have been permitted to continue in operation by regulators, its shareholders, and participants in the marketplace.

174.    As a result of TransUnion's wrongful conduct as alleged in this Complaint, including its implementation of inadequate data security measures, TransUnion has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and Class Members. Among other things, TransUnion continues to benefit and profit from the collection, maintenance, and sale of the PII while its value to Plaintiffs and Class Members has been diminished.

175.    TransUnion's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiffs' and Class Members' sensitive PII, while at the same time failing to maintain that information secure from intrusion and theft by hackers and identity thieves.

176.    Under the common law doctrine of unjust enrichment, it is inequitable for TransUnion to be permitted to retain the benefits it received, and is still receiving, without justification, from Plaintiffs and Class Members in an unfair and unconscionable manner. TransUnion's retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

177.    The benefit conferred upon, received, and enjoyed by TransUnion was not conferred officiously or gratuitously, and it would be inequitable and unjust for TransUnion to retain the benefit.

178.    Plaintiffs are without an adequate remedy at law.

179.    As a direct and proximate result of Transunion's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including those identified in paragraph 155 above.

180.    TransUnion should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them.

### FOURTH CAUSE OF ACTION
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**
**(Against Salesforce)**

181.    Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

182.    Plaintiffs and Class Members have an interest, both equitable and legal, in the PII about them that was conveyed to, collected by, and maintained by Salesforce and that was ultimately accessed or compromised in the Data Breach.

183.    Plaintiffs and Class Members conferred a monetary benefit upon Salesforce in the form of monies paid to Salesforce customers for services. Salesforce's business model would not exist save for the need to ensure the security of Plaintiffs' and Class Members' PII in order to provide cloud computing services to its customers.

184.    The relationship between Salesforce and Plaintiffs and Class Members is not attenuated, as Plaintiffs and Class Members had a reasonable expectation that the security of their PII would be maintained when they provided their information to Salesforce's customers, including TransUnion.

185.    By engaging in the conduct described in this Complaint, Salesforce has knowingly obtained and derived benefits from Plaintiffs and Class Members at Plaintiffs' and Class Members'

expense, namely the profits gained in exchange for the use of Salesforce's services, such that it would be inequitable and unjust for Salesforce to retain them.

186.    By engaging in the acts and failures to act described in this Complaint, Salesforce has been knowingly enriched by the financial gain. This profit should have been reasonably expended to protect the PII of Plaintiffs and the Class. Salesforce knew or should have known that theft of consumer PII was a constant threat, yet it failed to take reasonable steps to ensure the level of security required to have prevent the theft of consumers' PII.

187.    Salesforce's failure to direct profits derived from Plaintiffs' and Class Members' patronage of its customers toward safeguarding Plaintiffs' and Class Members' PII constitutes the inequitable retention of a benefit without payment for its value.

188.    Salesforce will be unjustly enriched if it is permitted to retain these benefits following the theft of Plaintiffs' and Class Members' PII.

189.    Salesforce's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the collection, maintenance, and inadequate security of Plaintiffs' and Class Members' PII, while at the same time failing to securely maintain that information from unauthorized access and compromise.

190.    Plaintiffs and Class Members have no adequate remedy at law.

191.    As a direct and proximate result of Salesforce's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including those identified in paragraph 155 above.

192.    Salesforce should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them.

**FIFTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs and the Class)**

193.    Plaintiffs restate and reallege all proceeding factual allegations as if fully set forth herein.

194.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described herein.

195.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their PII. Plaintiffs allege that Defendants still possess Plaintiffs' and Class Members' PII, and that Defendants' data security measures remain inadequate. Furthermore, Plaintiffs and Class Members continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

196.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, *inter alia*, the following:

        a.    Defendants owe a legal duty to secure consumers' PII under the common law and Section 5 of the FTC Act; and

        b.    Defendants continue to breach this legal duty by failing to employ reasonable data security measures to safeguard Plaintiffs' and Class Members' PII.

197.    This Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to protect consumers' PII.

198.    If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Salesforce. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiffs and Class Members will not have an adequate remedy at law because the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

199.    The hardship to Plaintiffs and Class Members if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiffs and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal. Defendants have a pre-existing legal obligation to employ such measures.

200.    Issuance of the requested injunction will not disserve the public interest. On the contrary, such an injunction would benefit the public by possibly preventing another data breach at Salesforce, thus eliminating the additional injuries that would result to Plaintiffs and consumers whose confidential information would be further compromised.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief as follows:

A.      for an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

B.   for an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

C.   for damages in an amount to be determined by the trier of fact;

D.   for an order of restitution and all other forms of equitable monetary relief;

E.   declaratory and injunctive relief as described herein;

F.   awarding Plaintiffs reasonable attorneys' fees, costs, and expenses;

G.   awarding pre- and post-judgment interest on any amounts awarded; and

H.   awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

A jury trial is demanded on all claims so triable.

Dated: September 23, 2025                    Respectfully submitted,

*/s/ Gary F. Lynch*
Gary F. Lynch (Bar No. 56887)
Nicholas A. Colella (Bar No. 1002941)
Patrick D. Donathen (Bar No. 330416)
**LYNCH CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
T: (412) 322-9243
gary@lcllp.com
nickc@lcllp.com
patrick@lcllp.com

Christopher L. Cornelius (ARDC # 6343186)
**LYNCH CARPENTER, LLP**
111 W. Washington Street, Suite 1240
Chicago, Illinois 60602
T: (312) 750-1265
chris@lcllp.com

James A. Francis (*pro hac vice* forthcoming)
**FRANCIS MAILMAN SOUMILAS, P.C.**
1600 Market Street, Suite 2510
Philadelphia, PA 19103
(215) 735-8600
jfrancis@consumerlawfirm.com

Jordan M. Sartell (ARDC No. 6310097)
**FRANCIS MAILMAN SOUMILAS, P.C.**
310 S. County Farm Rd., Suite H
Wheaton, IL 60187
(215) 735-8600
jsartell@consumerlawfirm.com

Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Rd., Ste. 200
Kansas City, MO 64112
T: (816) 714-7100
siegel@stuevesiegel.com

*Attorneys for Plaintiffs and the Proposed Class*